1
2
3
4
5          UNITED STATES DISTRICT COURT
6          CENTRAL DISTRICT OF CALIFORNIA
7          WESTERN DIVISION
8
9   EASTECH ELECTRONICS, *et al.*,      )      CASE NO. CV 07-3204 ODW (EX)
                                        )
10              Plaintiffs,             )      STATEMENT OF DECISION
                                        )
11  vs.                                 )
                                        )
12  E&S INTERNATIONAL                   )
    ENTERPRISES, INC., *et al.*,        )
13                                      )
                Defendants.             )
14                                      )
                                        )
15  _____ )

16
17  **I.    INTRODUCTION**
18          On May 16, 2007, Plaintiffs Eastech Electronics (Taiwan) and Eastern Asia
19  Technology Limited (collectively, "Eastech") filed this action against Philip Asherian,
20  Mark Barron, E&S International Enterprises, Inc. ("ESI"), and APH USA, Inc. ("APH")
    (collectively, "Defendants").  Plaintiffs alleged breach of contract, intentional and
21  negligent interference with business relations, and libel, among other claims.
22  Defendants counterclaimed, alleging several contractual claims.  The matter came on
23  for trial before the court October 8, 2008.  The court heard witnesses, considered
24  attorneys' arguments, reviewed deposition testimony, and received several hundred trial
25  exhibits.  Following trial, the parties submitted closing briefs setting out their respective
26  positions. (*See* Docket Nos. 204 – Eastech's; 205 – Defendants'.)  After considering the
27  evidence presented and the written submissions, the court finds as follows.
28

## II.   FINDINGS OF FACT

Plaintiff Eastech is a contract manufacturer headquartered in Taiwan and operates manufacturing facilities in China, Taiwan and other countries.  ESI and APH are California corporations with principal places of business in Van Nuys, California.  ESI and APH distribute consumer electronics to retailers (like Costco) in the United States and abroad.  Defendant Philip Asherian ("Asherian") is the Chief Executive Officer of ESI and APH.  At all relevant times, Asherian was an officer (and agent) of ESI and APH.  Defendant Mark Barron ("Barron") is the Chief Financial Officer of ESI.  At all relevant times, Barron was an officer (and agent) of ESI.

On or about January 4, 2005, Eastech and ESI entered into a written manufacturing agreement to facilitate future purchases by ESI from Eastech. (*See* Exh. 94) ("Manufacturing Agreement").  As part of the Manufacturing Agreement Eastech and ESI also entered into the Return Policy, Warranty and After-Sales Service Agreements ("Return Agreements"). (Id.)  In June 2006, the parties arranged to use Bank SinoPac ("SinoPac") as a "factor" to provide advance money to Eastech based upon purchase orders from ESI and APH. (Exh. 1286.)[1]  Eastech, in turn, assigned its accounts receivable with recourse to SinoPac as collateral for the advanced money.

Several problems arose between the parties during their relationship.  First, Eastech delivered a shipment of televisions with defective "inverter boards."  This problem affected many units in a shipment of unknown quantity. (Exh. 61.)  Eastech remedied this problem by replacing the inverter boards. (Id.)  It is not clear how many units were defective, nor how many were returned to Costco due to that defect.

---

[1] "Factoring is . . . the sale of accounts receivable of a firm to a factor at a discounted price.  In return for selling the accounts receivable at a discounted price, the seller receives two immediate advantages: (1) immediate access to cash; and (2) the factor [usually] assumes the risk of loss."  *In re Straightline Investments, Inc.*, 525 F.3d 870, 876 (9th Cir. 2008) (citation omitted); *see also Dobin v. Presidential Fin. Corp. of Del. Valley*, 312 B.R. 262, 265 (D.N.J. 2004) (describing "factoring" as a situation where one party advances a loan to the other for a security interest in the other party's accounts receivable).

Eastech also shipped televisions to Costco with boxes mislabeled "HDTV" (High Definition).  This problem led Asherian, with help from Tak Iwao (an ESI/APH agent), to draft APH Debit Memo # 21994 ("DM 21994"), which put the estimate for remedying the mislabeled boxes at $1,193,636.40. (Exhs. 58, 91.)  A chart allocating the specific costs underlying the $1,193,636.40 was sent to Eastech on February 16, 2006. (Exh. 54.)  Stephen Chow, an Eastech representative, replied that "by looking at this number, [it] seems not right." (Exh. 297.)  On February 22, 2006, Tak Iwao, on behalf of ESI/APH, informed Chow that some of the anticipated costs might not be incurred because Costco meant simply to cover up the "HDTV" label with white stickers, but added that other costs might be incurred as a result of the mislabeled boxes. (Exhs. 213, 55.)  Iwao suggested, among other things, that Costco might require "ESI to pay [Marketing Development Fund] based on this issue." (Id.)

Negotiations ensued between Eastech and Defendants regarding resolution of the mislabeling issue.  Following a March 2006 meeting between Eastech and ESI/APH, the parties set up another meeting for May 2006. (Exhs. 53, 57.)  By email from Iwao to Eastech's Chow, ESI/APH requested a meeting to discuss "Box Issue ($1.2M)" and other issues. (Exh. 53.)  The parties disagree on the precise agreement reached, but this much is clear: ESI (and APH) would take $10 per unit deductions off of purchases up to the maximum $1,193,636.40 set forth in DM 21994.  APH took $362,320.00 in such credits. (*See*, *e.g.*, Exhs. 235, 241) (deductions from purchase orders).[2]

---

[2] A discrepancy concerning the corporate status of ESI and APH underlies Defendants' relationship with Eastech, and colors many of the parties' arguments.  Given both parties' disregard of the separate corporate entities of ESI and APH, the court treats the two as one.  While the Manufacturing and Service Agreements were executed by Eastech and ESI, for example, APH placed (and Eastech accepted) orders under those agreements, and the parties otherwise treated ESI and APH as the same entity. (*See*, *e.g.*, Exhs. 94, 1026, 1027, 1105.)  Defendants utilized consolidated financial sheets and records, moreover, and, as relevant here, Eastech contemplated resolution of the mislabeling problem with ESI, not just APH – as Eastech suggests in its closing brief. (*See* Docket No. 204 at 43) ("APH and ESI entered into a settlement agreement with Eastech as to APH and ESI's alleged costs to remedy the giftbox issue . . . Asherian agreed to charge [Eastech] only whatever Costco charged ESI/APH to remedy the giftbox issue.").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

While the parties disagree on the specifics of the agreement, the court finds that the settlement figure related only to resolution of the box mislabeling incident. The court also finds that the deductions applied to future orders by ESI/APH, and were subject to proof of actual costs. First, virtually every relevant piece of physical evidence, including DM 21994 itself, suggests that the settlement was limited to the box mislabeling incident. (*See*, *e.g.*, Exhs. 18 at 2, 53-58, 91, 240 , 241.) The only evidence suggesting otherwise is Defendants' testimony, which proved less than credible in light of the documentary evidence.

Second, the parties' conduct in deducting the settlement figure from future purchases, coupled with Eastech's consistent reluctance to accept a lump sum deduction leads the court to find that the deductions applied only to future purchases and were subject to proof of actual costs incurred by APH/ESI. For example, when Mark Barron attempted to gain "approval by an officer of Eastech on the attached [DM 21994]," Eastech's Colleen Hallam immediately responded that "this was not the agreement made." (Exh. 60) ("Eastech will continue to make payments through current purchase price reductions and does not concur in your statement that you [reserve the right] to offset this obligation with balances owed to Eastech at any time."). And, following two weeks of testimony and numerous recorded depositions, the court simply believes Eastech's witnesses over Defendants' concerning the terms of the agreement.

Third, the court finds that the deductions were subject to proof of actual costs incurred by APH/ESI. Following the March settlement meeting, Steve Liao (Eastech's vice president) sent Asherian an email thanking him for assuring that "ESI [will] only bill Eastech whatever Costco charge[s] APH/AKAI" and imploring him to "help Eastech [ ] keep the cost down." (Exhs. 57, 216, 233.) Other exhibits corroborate the requirement of proof. (*See*, *e.g.*, Exh. 300) (Eastech needs "feedback on [ ] Costco charge" and "billing from Costco if any"). The credibility of Eastech's witnesses – in light of the physical evidence – further underlies this finding.

Sometime in 2006, Eastech began negotiating a large loan with Bank SinoPac (the "Syndicated Loan"). (So Depo. at 26:1-12; 33:1-6; 34:8-18; 35:3-15.)  This loan was to be secured in large part by accounts receivable from Eastech's customer, Philips. On August 28, 2006, Eastech's Chow sent ESI's Iwao an email notifying him that $1 million is past due and that another $2.6 million will be due within days. (Exh. 243.) Chow again expressed Eastech's concern regarding the past due accounts on September 5, 2006. (Exh. 245.)

On September 15, 2006, Barron sent Eastech's Colleen Hallam an email seeking approval of DM 21994. (Exh 92.)  Ms. Hallam declined the request, stating "this is different from what we discussed." (Id.) ("The arrangement that was made regarding this amount has always been that it would be deducted from future purchases at $10.00 per unit.").  Barron replied that DM 21994 "was due and payable effective November 28, 2005 when it was written." (Exh. 93.)  Hallam promptly responded (copying Iwao) "this was not the agreement made." (Id.)  On November 14, 2006, Asherian emailed Barron and Iwao stating that ESI/APH's "future with [Eastech] is doubtful," and "we need to hold the total chargeback on the [money] they owe us." (Exh. 45.)

On January 24, 2007, George Talavera from Bank SinoPac emailed Mark Barron to inform him that nearly $3.4 million is past due. (Exh. 18 at 3.)  Barron informed Talavera that ESI's "business relationship has ended with Eastech" and that ESI is in the process of preparing a final accounting, including certain "hold back amounts [ ] to cover our future returns." (Id.)  On February 2, 2007, Talavera sought an update from Barron. (Id. at 2.)  Barron informed Talavera that some payments had been made and claimed $805,585.76 in deductions resulting from the mislabeling issue as well as a $600,000.00 "reserve for [future] returns." (Id.)  On February 5, 2007, Barron informed Talavera that ESI's "business with Eastech will continue." (Id. at 1.)  Confusion over the past due payments led SinoPac to contact Eastech in search of an explanation.

Eastech became concerned that problems with its accounts receivable might negatively affect the Syndicated Loan from SinoPac.  On February 7, 2007, Chow sent Iwao an email asking the latter to call him because "Mark Barron [was] giving [SinoPac] wrong information, and this is totally mess[ing] up the relationship [with SinoPac]." (Exh. 253) ("SinoPac just inform[ed] us that their US office [had been] told by ESI's CFO [that] (i) they will stop [doing] business with Eastech and (ii) they will claim [$1,000,000 in credit]").  Iwao assured Chow that "the comment from SinoPac to Eastech is incorrect." (Id.)  Iwao also informed Chow that Barron discussed the matter with Ming Dai, a SinoPac representative in Los Angeles, and that "Ming is going to explain to SinoPac [Hong Kong]." (Id.)

On February 16, 2007, SinoPac Hong Kong's Steve Chan sent Eastech's CFO, Sunny Ng, an email informing him of a message from ESI. (Exh. 254.)  The email related that ESI returned $699,094.00 worth of goods to Eastech "and ESI expressed they will not pay anything until all inventory is sold; it is the most updated message we got from our [Los Angeles] branch." (Id.) (emphasis in original).  On February 20, 2007, Chow sent Iwao an email attaching SinoPac's email and asking "do you know what this [refusal to pay until all inventory is sold] is all about?" (Id.)  On February 28, 2007, Chow sent a similar email to Mark Barron, taking issue with the refusal to pay until all inventory is sold, informing him that his "negative" communications with SinoPac are "affecting the current credit application" [i.e., the Syndicated Loan], and asking Barron to contact him before any further communications with SinoPac. (Exhs. 255, 266.)[3]

---

[3] As part of the factoring agreement underlying the parties' dealings, Eastech sent ESI a Notice of Charge. ESI relies on this document for the proposition that it was not required to clear any communication with Eastech before contacting SinoPac. This Notice of Charge provides: "We irrevocably and unconditionally instruct and authorise you (notwithstanding any previous directions which we may have given you to the contrary): (a) unless otherwise directed by Bank, to furnish or disclose to Bank in addition to the Company all notices, matters or things required to be furnished and disclosed to the Company under any agreement between the Company and yourselves."  Mark Barron's failure to consult with Eastech before contacting SinoPac does not bear on the court's decision.

On March 6, 2007, while still attempting to collect on the past due accounts, SinoPac's Talavera sought from Mark Barron a "time frame [for] when [the] hold back for defectives will be released and all credit/deductions will be finalized." (Exh. 18.) Talavera reminded Barron that the merchandise was ordered five months earlier and suggested "surely you have an idea percentage wise on how much returns you would anticipate based on historical performance and quality of the merchandise received from Eastech." (Id.)  On March 19, 2007, SinoPac offered Eastech a $110 million uncommitted term sheet relating to the Syndicated Loan. (Exh. 1290.)

On March 30, 2007, ESI's Mark Barron (with help from Iwao) sent a letter to SinoPac's Talavera purporting to explain the situation.  This letter, which forms the basis for Eastech's tort claims, provides:

> It has come to my attention that Eastech has yet to resolve the outstanding issues on their account and that it may affect the relationship between SinoPac and ESI.  At this time I would ask that SinoPac take the amount related on the DM # 21994 in the amount of $1,193,636.40 less the amounts already paid back by Eastech of $362,320 or $831,336.40 off the books and ask Eastech to reimburse SinoPac directly. Please be aware of the following facts relating to this chargeback.
>
> ESI and Eastech signed a Manufacturing Agreement on January 5, 2005. Eastech's Senior Vice President, Steve Liao, signed the agreement on behalf of Eastech. Under the terms of the [ ] agreement, per Form A-01, Section 1 b, provisions were made for Epidemic Defects (a failure rate in excess of the 5%) which states that manufacturer is responsible for all costs associated with epidemic failure.
>
> [W]e are a company that values our relationships with our vendors and have long term relationships as a result. Eastech has continually failed to fulfill their commitments under the agreement. Outline of the facts are as follows:
> (1) Eastech accepted our purchase order under the terms of our manufacturing contract for delivery of a 20" LCD TV. Eastech shipped the product 30 days late and thereby missed the promotion period of our customer, Costco. Obviously, Costco was very upset at the delayed shipment. (2) The original box of the 20" LCD TV was labeled as a High Definition (HD) TV whereas the actual unit was not HD. This created quite an embarrassment and loss of credibility for ESI after this material problem was found out by our customer when the product was already on their sales floor.  Needless to say, Costco was extremely aggravated by this situation. (3)  Finally, this 20" LCD TV had a power failure defect that resulted in epidemic failure rate far in excess of our epidemic failure rate of 5%.  Although ESI allowed Eastech to provide a remedy for this problem, by this time Costco had elected to discontinue their product 4 months early.
>
> Eastech acknowledged their responsibility in every one of these cases and accepted to credit $1,193,696.40 for the damages caused by these events. Eastech to date has credited ESI the amount of $362,320 leaving an outstanding balance of $831,336.40.

1

> Although ESI would like to move forward with Eastech and continue an amicable working relationship, it has come to a point where we are concerned that this may affect our valued relationship with Bank SinoPac and ask that you remove this balance from our account immediately.

2

3

(Exh. 47) (the "Barron Letter").

4

On April 15, 2007, SinoPac sent Eastech a second uncommitted term sheet for

5

$120 million. (Exh. 390.)  Henry So, an Assistant Vice President and a lending officer

6

with SinoPac, explained that the $10 million increase from the first term sheet "was to

7

accommodate the size of the Philips receivables." (So Depo at 16:15-17; 52:21-23.)  So

8

was responsible for recommending the Syndicated Loan to SinoPac's Credit

9

Committee, which was the final decision maker on such loans. (Id. at 26:7-8.)

10

SinoPac's final round of due diligence commenced sometime in April 2007. (Id. at

11

42:7-10.)  SinoPac undertook to assess Eastech's financial position, its accounts

12

receivable, and visited Eastech's China factory. (Id. at 37:7-14.)  So testified that, at

13

some point, the Credit Committee requested an independent audit of "all the accounts

14

receivable of Eastech" and noted that such request by the committee was "unusual." (Id.

15

at 50:1-6.)  So further testified that the independent audit was never completed. (Id. at

16

67:6-12.)

17

SinoPac's Credit Committee turned down the Syndicated Loan "on or about April

18

23, 2007." (Id. at 43:1-9.)  Over objection from Defendants, So testified that the loan

19

was turned down for "several reasons and one was the [problem with Eastech's

20

accounts receivable from ESI]." (Id. at 44:9-23.)  Over hearsay objections, So also

21

testified that Angus Chen, SinoPac's President, pointed out "there must be some

22

problem with [Eastech's] accounts receivable." (Id. at 6716-22.)  Without objection, So

23

also testified that Mr. Chen "instructed us to have an investigation ... [and absent] a very

24

comfortable result, we should not go ahead with [ ] this proposed loan." (Id. at 71:12-

25

15.)  So opined that the claims made by ESI in the Barron Letter were "a substantial [or

26

important] factor" in SinoPac's decision to turn down the loan. (Id. at 45-46.)

27

Other facts will be discussed as necessary.

28

8

## III.   DISCUSSION

### *Eastech's Tort Claims*

Eastech alleges the following tort claims against Asherian, Barron, ESI, and APH – all arising out of the Barron Letter: 1) Intentional Interference with Contract; 2) Intentional Interference with Prospective Business Advantage; 3) Negligent Interference with Prospective Business Advantage; and 4) Libel per se. (Claims 7-10.)

Before considering the individual elements of these claims, the court must first determine whether the "common interest privilege" applies to the Barron Letter – precluding Eastech's tort claims as a matter of law. *See* Cal. Civ. Code § 47(c); *see also Kachlon v. Markowitz*, 168 Cal.App.4th 316 (Ct. App. 2008) ("Although the section 47 privileges were originally applicable only to defamation actions, case law now recognizes that the privileges apply to all torts except malicious prosecution.").

Common Interest Privilege

"California's common interest privilege, Cal. Civ. Code § 47(c), immunizes a person's statement to others on matters of common interest from liability in tort, provided that the person did not act with malice." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735-36 (9th Cir. 1999) (citation omitted). The privilege applies to those acting to protect a pecuniary or proprietary interest, and between parties in a contractual, business, or similar relationship. *Family Home & Fin. Center, Inc. v. Fed. Home Loan Mortg. Corp.*, 461 F.Supp.2d 1188, 1197 (C.D. Cal. 2006) (citation omitted). Application of the privilege involves a two-step analysis. "The defendant has the initial burden of showing the allegedly defamatory statement was made on a privileged occasion, whereupon the burden shifts to the plaintiff to show the defendant made the statement with malice." *Kashian v. Harriman*, 98 Cal.App.4th 892 (Ct. App. 2002) (citation omitted). Whether the privilege applies in a particular case is a question of law for the court. *Id.* at 1198.

The parties do not dispute that the letter was made on a privileged occasion – in response to SinoPac's payment inquiries. (August 21, 2008 Order; Docket No. 101.) Rather, Eastech argues Defendants abused the privilege and or acted with malice.

### Abuse of the Common Interest Privilege

First, the common interest privilege "may be lost if the defendant abuses the privilege by [ ] the inclusion of immaterial matter which have no bearing upon the interest sought to be protected." *SDV/ACCI, Inc. v. AT & T Corp.*, 522 F.3d 955, 962 (9th Cir. 2008) (citations omitted).  Eastech argues Defendants "abused the privileged occasion on which the Barron Letter was written by including substantial gratuitous, false and negative information about Plaintiffs that went well beyond the response called for by SinoPac's payment inquiries." (Docket No. 202 at 6.)  The court agrees.

The court does not quarrel here with Defendants' assertion of their alleged right to a "chargeback."  Nor is the inclusion of facts underlying the right to a chargeback unreasonable in such letters. *See SDV/ACCI, Inc.*, 522 F.3d at 962 ("The standard is one of reasonableness, not of necessity.") (citation omitted).  Rather, the court finds that the Barron Letter paints too colorful a picture.

Assuming the truth of Defendants' assertions, and accepting that the inclusion of "facts relating to [the] chargeback" is reasonable, Defendants' letter abused the privileged occasion by including inflammatory and irrelevant matter unreasonably disparaging Eastech.  This includes such statements as "Eastech has continually failed to fulfill their commitments under the agreement," and Costco became "very upset" and "extremely aggravated" at some alleged failures by Eastech. (Exh. 47) ("[Box mislabeling] created quite an embarrassment and loss of credibility for ESI after this material problem was found out by our customer when the product was already on their sales floor.").  Irrespective of Defendants' state of mind as to the truth of these assertions, they go so far beyond the response called for by SinoPac's payment inquiries (and so color the letter) as to abuse the common interest privilege.

*Defendants Acted With Malice* [4]

"The malice necessary to defeat a qualified privilege is 'actual malice' which is established by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable ground for belief in the truth of the publication and thereafter acted in reckless disregard of the plaintiff's rights." *Taus v. Loftus*, 40 Cal.4th 683, 721 (2007) (internal quotations and citation omitted) (emphasis in original).  Malice may not be inferred from the fact of communication itself. *Noel v. River Hills Wilsons, Inc.*, 113 Cal.App.4th 1363 (2003).

Given the court's belief that Defendants abused the privileged occasion, the following excerpt on malice appears most apt:

> "The manner of statement is material upon the question of malice, and if the facts believed to be true are exaggerated, overdrawn, or colored to the detriment of plaintiff, or are not stated fully and fairly with respect to the plaintiff, the court or jury may properly consider these circumstances as evidence tending to prove actual malice, and they may be sufficient for that purpose without other evidence on the subject. [citations]"

*Shumate v. Johnson Pub. Co.*, 139 Cal.App.2d 121, 138 (1956).

Here, Eastech did not miss Costco's "promotion period," nor did Costco elect to "discontinue their product 4 months early" because of  Eastech, as Defendants claim. (*See* Exh. 47.)  Some of Defendants' other assertions are similarly exaggerated (if not fabricated), moreover, and plainly "colored to the detriment" of Eastech.  Following eleven days of trial testimony and much evidence, the court finds that the Barron Letter falls within the rule articulated above. *See Shumate*, 139 Cal.App.2d at 121; *see also Brewer v. Second Baptist Church of Los Angeles*, 32 Cal.2d 791, 799 (1948) ("Although malice may not be inferred from the fact [ ] of the communication of a defamatory statement, [citation], the tenor of the statement may be evidence of malice.").  Here, the letter begins reasonably and similarly concludes, but its digression into immaterial and inflammatory matter evinces malice and destroys the privilege.

---

[4] The court considers the issue of malice insofar as abuse of the privilege was not established.

*The Individual Defendants*

"As respects a publication by writing, a libel, not only the publisher, but all who in [anyway] aid or are concerned in the publication of the writing are liable as publishers; the publication of the writing is the act of all concerned in the production of the writing.  Thus, if one composes and dictates, a second writes, and a third publishes, all are liable as publishers, and each is liable as a publisher." *In re Kowalsky*, 73 Cal. 120, 124 (1887) (internal quotations and citation omitted); *see also Osmond v. EWAP, Inc.*, 153 Cal.App.3d 842, 852 (1984) ("[E]veryone who takes a *responsible* part in the publication is liable for the defamation.") (italics in original).[5]

Defendants argue the only relevant state of mind bearing on the issue of actual malice is that of Mark Barron, the person who signed and sent the letter.  Before the court revisits its previous observation that Barron appears to "lack[] the requisite mental state" for malice (Docket No. 205 at 1), it bears clarifying that the relevant state of mind is that of any and all taking a responsible part in the publication.  Otherwise, the person dictating a defamatory statement could simply escape liability (for libel, at least) by employing an innocent agent to write, sign, and send the libelous publication. *Cf. Sheppard v. Freeman*, 67 Cal.App.4th 339 (1998) (recognizing conspiracy theory of libel and remanding "as to whether any of the defendants acted with malice.").

Given the discussion above, Barron bore the requisite malice by including irrelevant matter and so coloring the letter as to exceed the scope of privilege.  Barron also knew that Eastech did not acknowledge ESI/APH's right to a set off, as evidenced by clear communications from Hallam (and other Eastech representatives) shortly before the letter was sent. (*See*, *e.g.*, Exhs. 92, 93.)  Tak Iwao, who is not party to this action, not only directly participated in composing the letter, but also knew that many of the alleged facts were either contrived or grossly exaggerated.  Asherian similarly knew, and directed the publication. (*See* Exh 1369 ¶¶ 97, 115.)

---

[5] Again, the interference underlying Eastech's several tort claims is the publication of the Barron Letter.

Eastech Did Not Establish Causation as to the Syndicated Loan [6]

Eastech's tort claims rest on the effect of the Barron Letter on the Syndicated Loan and the factoring facility.  Resolution of this issue thus affects Eastech's claims for intentional and negligent interference with contract and prospective economic advantage, and the recovery of related actual damages under Eastech's libel claim. Eastech argues at times that Defendants' failure to pay under the parties' agreement led SinoPac to deny the Syndicated Loan, but, as Mr. Bordo often pointed out, Eastech's theory of the case had always been that the Barron Letter was the act of interference. (*See* Docket No. 205 at 12) ("As a proximate result of the Barron Letter, Eastech lost the $120 million loan facility from SinoPac") (quoting First Amended Complaint); (*see also* Final Pretrial Order.)  Thus, the court will only consider those arguments relating to the Barron Letter.

"*Substantial Factor" Standard*

"The term 'substantial factor' has not been judicially defined with specificity, and indeed it has been observed that it is 'neither possible nor desirable to reduce it to any lower terms.'" *Rutherford v. Owens-Illinois, Inc.*, 16 Cal.4th 953, 969 (1997) (*quoting* Prosser & Keeton on Torts § 41, p. 267).  The California Supreme Court explained that a force which plays only an "infinitesimal" or "theoretical" part in bringing about injury or loss is not a substantial factor. *Id.*  It warned, however: "Undue emphasis should not be placed on the term 'substantial.' [T]he substantial factor standard . . . has been invoked by defendants whose conduct is clearly a 'but for' cause of plaintiff's injury but is nevertheless urged as an insubstantial contribution to the injury.  Misused in this way, the substantial factor test undermines the principles of comparative negligence, under which a party is responsible for his or her share of negligence and the harm caused thereby." *Id.*

---

[6] The court previously held, without elaboration and perhaps inartfully, that the testimony of Henry So does not establish the requisite causation between the Barron Letter and SinoPac's declination of the Syndicated Loan. (*See* Docket No. 189.)  As explained below, the court abides by that conclusion.

1    Although varying language has been used to express the causation requirement,

2    "the cases generally agree it must be reasonably probable that the prospective economic

3    advantage would have been realized but for defendants' interference." *Youst v. Longo*,

4    43 Cal.3d 64, 71 (1987); *see also Viner v. Sweet*, 30 Cal.4th 1232, 1239 (2003)

5    (defendant's misconduct "is *not a substantial factor* in bringing about harm to another *if*

6    *the harm would have been sustained even if the actor had not*" engaged in the alleged

7    misconduct) (italics in original).  Eastech bears the burden of proving causation.

8    It is best to remember here that the question is not whether Defendants' conduct

9    overall was a substantial factor in the declination of the loan, but whether the Barron

10   Letter caused the declination.  The evidence as a whole does not establish the latter.

11   Primarily, Eastech relies on the testimony of former SinoPac representative Henry So,

12   who recommended the Syndicated Loan to SinoPac's Credit Committee.  Mr. So did

13   not make the decision to deny the loan, however, and his testimony does not establish

14   that the Barron Letter caused the declination.  At best, his testimony is speculative, and

15   the evidence insubstantial.

16   Briefly, Henry So explained that SinoPac had been seriously considering the loan

17   to Eastech, but that several factors led to its declination – including a downward

18   economy and weak markets.  The court's prior order on the issue said this much.  But it

19   was neither exhaustive nor explanatory.  Now, in Eastech's own words:

> So testified that around April 23, 2007, he participated in a SinoPac loan committee
> meeting at which the Syndication Loan was turned down.  So testified that at the
> meeting, SinoPac president Angus Chen pointed out that there was an overdue
> amount owed by ESI on the Factoring Facility and that this indicated [] there
> was a problem with Eastech's accounts receivable.  So testified that at that time Chen
> told him to 'stop' the Syndication Loan.  So [separately opined] that the Barron
> Letter was a substantial factor in SinoPac's withdrawal of the Syndication Loan.
> So explained that by 'substantial factor' he meant 'material' or 'real' factor."

(Docket No. 204 at 13) (citations omitted).

14

Assuming So's deposition testimony sufficiently establishes that ESI/APH's failure to timely pay on the account caused the loan to be declined, So does not relay that the decision maker(s) knew about the Barron Letter, much less that it was a substantial factor in the ultimate denial.  The court is mindful of So and Ming Dai's opinions that the Barron Letter played part in the denial of the loan, but in light of the evidence as a whole, the effect of the letter on the denial of the loan is largely theoretical.  Of course the letter was offensive and Defendants' conduct reprehensible, but Eastech may only recover those damages proximately caused by the offense.  Given that the letter was also but a proverbial drop in the bucket of the parties' relationship – as well as the several (more reasonable) reasons underlying the denial – the letter played an infinitesimal part, if any. (*See*, *e.g.*, Docket No. 205 at 12-14.)

Accordingly, because Eastech has not established that the Barron Letter caused them to lose the loan, they cannot recover damages resulting therefrom.  This disposes of the intentional and negligent interference with prospective advantage claims.  Eastech's claim for interference with the factoring facility fails for the same reason.  As to the libel per se claim, which does not require causation for presumed damages, Eastech shall recover **$375,000**. *See Contento v. Mitchell*, 28 Cal.App.3d 356, 358 (Ct. App. 1972) ("loss of reputation" and "shame" are presumed in libel per se).  As discussed above, the Barron Letter contains multiple falsehoods tending to injure Eastech in its business.

The court concludes by noting that Eastech's claimed damages are problematic.  Mainly, Eastech neither demonstrates a likelihood of profitability – a difficult task in light of its consistent losses and the purpose of the loan (entry into new markets) – nor the amount with reasonable certainty.  Other claimed damages are likewise questionable, and largely uncertain in both fact and amount.[7]

---

[7] Eastech's motion to strike the financial information charts on pages 15, 16, and 23 of Defendants' closing brief (Docket No. 205) is GRANTED.  (*See* Docket No. 208) (motion to strike).

***Eastech's Contract Claims***

First Four Claims

Eastech's First, Second, Third, and Fourth Claims are for recovery of payments on goods shipped to and received by ESI and APH. (Docket No. 204 at 24.) "ESI does not dispute the . . . amount of $1,915,934.00 [attributed to these claims]." (Docket No. 205 at 38; *see also* Exh. 1000.) Eastech, in turn, concedes that from this amount, "ESI and APH [are] due a net credit of $590,787.00 based on the parties' return and replacement activity." (Docket No. 204 at 25.) Accordingly, Eastech shall recover $1,325,147.00 on its first four claims.[8]

Fifth Claim

"Eastech's Fifth Claim is for recovery of lost profits and the cost of nonsalvageable goods for APH purchase order P500001128." (Docket No. 204 at 26.) Defendants do not contest that cancellation of the purchase order constitutes a breach, but argue this claim fails because "an agreement was reached between Eastech and ESI for acceptance of the cancellation." (Docket No. 205 at 40.) The court finds that the agreement reached between Chow and Iwao – employees with apparent authority regarding such matters – entitles Eastech to the cost of the unsalvageable goods, but not the lost profits associated with that purchase order.

Purchase Order # P500001128 was issued by APH on July 25, 2006 for 4,192 units of model number CFTD2011 20-inch combination LCD TV/DVD units. (Exh. 241.) On August 24, 2006 Iwao sent Chow an email to put the order "on hold." (Exh. 242.) On August 28, 2006, Chow explained that the purchase order cannot be cancelled because Eastech had already obtained the parts necessary to fill the order. (Exh. 243.)

---

[8] Defendants argue in one of their counterclaims that they are entitled to further reductions in the amount of $136,164. (Docket No. 205 at 34-36.) If such entitlement is established once that claim is considered, this amount shall be reduced accordingly.

On September 1, 2006, Chow wrote Iwao and again explained that the purchase order could not be cancelled because the (soon to be obsolete) parts had already been acquired. (Exh. 244.)  In this email, Chow offered to use the monitors in stand-alone TVs if APH and ESI agree to order that product. (Id.)   Chow stated that Eastech "will keep [] the rest of [the] materials and hope you can . . . cover this very soon." (Id.) Otherwise, "[t]op management will request me to bill you [for] the rest of [the] parts."

On September 6, 2006, Iwao sent Chow an order for televisions incorporating the monitors discussed above. (Exh. 245.)  Iwao added that the "cancellation [ ] should be accepted based on these orders" and requested "confirmation." (Id.)  Chow promptly replied that, "as we discussed, Eastech cannot [ ] cancel the order." (Exh. 246.)  Chow again explained that Eastech will charge ESI for the unused parts unless ESI could find a buyer. (Id.)  On September 11, 2006, Iwao informed Chow that ESI cannot use the parts, adding: "Please understand that ESI placed [the] order of 9K units based on the acceptance of cancellation." (Exh. 2102.)

Eastech seeks $353,061.00 for the nonsalvageable parts and $95,206.00 in lost profits associated with the cancelled purchase order. (Docket No. 204 at 28.)  As the foregoing exchange illustrates, to the extent any agreement was reached, Eastech consistently reserved the right to recover the cost of unsalvageable parts.  ESI's sole argument in opposition is that Eastech failed to mitigate its damages. *See Valle de Oro Bank v. Gamboa*, 26 Cal.App.4th 1686, 1691 (1994) ("A plaintiff may not recover for damages avoidable through ordinary care and reasonable exertion.").

Here, Eastech mitigated its damages by using the monitors to manufacture stand-alone TVs, and any attempt to dispose of the remaining parts would have been futile. ESI does not dispute that the remaining parts would soon be rendered obsolete by the "ATSC requirement," (Exh. 244), and ESI itself could not use the parts. (Exh. 2102.) Thus, because ESI does not dispute the claimed price of those parts, Eastech shall recover **$353,061.00** on this claim.

This brings us to the issue of lost profits.  On the one hand, Defendants neither dispute the fact of breach (aside from arguing acceptance thereof) nor the calculation of profits.  On the other hand, while Chow reserved Eastech's right to recover for the cost of unused parts, he appears to have agreed away lost profits.  Resolution of this issue thus turns on whether the parties reached an agreement, and whether such agreement contemplated the recovery of lost profits.

The court finds an agreement was reached for cancellation of the purchase order without Eastech's recovery of profits.  Chow's September 1, 2006 email to Iwao constitutes an offer to accept Eastech's cancellation of the purchase order subject to ESI's purchase of TVs incorporating the monitors and assumption of responsibility for the remaining parts. (Exh. 244.)  On September 6, 2006, Iwao expressly accepted that offer, ordering nine thousand units incorporating the monitors. (Exh. 245.)  The following day, Chow informed Iwao that "Eastech will [be] force[d] to take your cancellation request, but will charge you the materials." (Exh. 246.)  No mention of lost profits is ever made, nor was such recovery contemplated by the parties.  And, Iwao's final communication does not indicate lack of intent, but an attempt to renegotiate.

<u>Sixth Claim</u>

Eastech's sixth claim is for breach of the Return Agreements.  Specifically, Eastech takes issue with ESI's refusal to accept a shipment of returned units after they had been repaired.  The Return Agreement provides that for all products returned to Eastech by ESI, "Manufacturer shall replace to new product . . . ." (Exh. 94.)  Pointing to this provision, Defendants argue they were under no obligation to accept refurbished or repaired units. (Docket No. 39-40) ("In addition, Eastech failed to prove that any of the agreed upon procedures for purchase and sale of returned units were followed.").

Barron admitted that Eastech had the right to ship replacement goods to ESI for all returns.  Chow testified it was the parties' practice that, as repaired units became ready, Eastech would simply make an appointment with ESI's warehouse and would be permitted to ship them back upon ESI's issuance of a purchase order. (Trial

Test.10/7/08 AM at 49-52; *see also* Exh. 1068.)  At times, returns were made without the issuance of a purchase order, but still at the authorization of ESI. (*See*, *e.g.*, Exhs. 1058, 1059.)  Iwao testified that Eastech requested a purchase order for the subject goods, but he refused to provide it. (Trial Test., 10/15/08 AM at 89:23-90:9.)  This was the only shipment of replacement goods ever refused. (Id. at 90:22-24.)

First, ESI had always accepted repaired goods, and cannot now justify its rejection based on the fact that the goods were not "new."  To the extent the Return Agreements required such goods (Exh. 94 at 10, 1a), ESI/APH waived that term. *See* 13 Williston on Contracts § 39:27 (4th ed.) ("[T]he well-known rule regarding waiver of contractual requirements [is that a] party [ ] may by express agreement or by his own course of conduct waive his legal right to insist on strict performance of the covenants of the contract.") (internal quotations and citation omitted).  ESI's other argument – that Eastech failed to prove that the agreed upon procedures for returning goods were followed – is also unavailing.

As discussed above, the parties' "procedure" consisted of Eastech informing ESI that repaired units were ready for shipping, followed by ESI's issuance of a purchase order for those goods. (*See*, *e.g.*, Exh. 1068.)  Some times, this procedure was not followed. (*See* Exhs. 1058, 1059.)  "Iwao testified that Eastech requested a purchase order for [the repaired] goods, but he refused to provide it." (Docket No. 204 at 29.)  Thus, to the extent any procedure was mandatory, Eastech did its part, and ESI cannot argue that its own failure to issue a purchase order precludes recovery in this instance. The court's decision is guided by two important facts.  First, throughout the parties' relationship, repaired goods were accepted as a matter of course, and ESI's refusal to accept this particular shipment was in fact the first such refusal.  Second, the goods involved here were branded with trademarks controlled by ESI and APH, and could not be sold by Eastech.  Accordingly, Eastech shall recover **$170,709.00** for the value of these goods and **$5,968.79** for storage. (Exhs. 1012-15.)

***Defendants' Counterclaims***

1.      Breach of Contract

*One Percent Fee In Lieu Of Service Support Hotline*

ESI seeks $314,641.00 in damages arising from Eastech's failure to maintain a toll free telephone number for after-sale service to consumers. (Docket No. 205 at 29-30.)  Under the Manufacturing Agreement, Eastech was required to either maintain such service or provide ESI credit in "an amount equal to one percent of [ESI's] costs as a service fee." (Exh. 94.)  Pointing to a series of emails before the first purchase order under the Manufacturing Agreement, Eastech argues the parties modified their agreement and/or ESI/APH waived this provision.  The court agrees.

On May 18, 2005, Yumi Kametani (Iwao's predecessor at ESI/APH) informed Chow that "Per our meeting, we need Eastech to revise your price with [the] following Return & After Service Policy [provisions]." (Exh. 1105.)  As relevant here, Kametani proposed that APH provide the 1-800 number and after-sale service to consumers and that Eastech pay a 1% charge from the total PO amount. (Id.)  On May 19, 2005, Chow responded that Eastech would accept these conditions in return for a $302/unit price. (Id.)  That same day, Chow emailed Chorbajian, Kametani and others at ESI/APH proposing the terms that Eastech would accept at a price of $300/unit. (Exh. 1027 at 2.)  In this email, Eastech agreed to "pay 1% Hotline service to ESI for covering phone line customer service." (Id.)  Kametani asked for a $295/unit price under those terms. (Id.)

Chow responded that Eastech would accept the $295/unit price, but only if ESI/APH agreed to forego some of the Return Agreement terms. (Id.)  Eastech specifically stated that, at $295/unit, it would not accept the "1% hotline service and return RMA shipment charge to China." (Id.)  On May 23, 2005, Kametani responded by attaching a purchase order for the TVs at the $295/unit price. (Exh. 1098)  This purchase order included some of the terms contemplated by the parties but not the 1% hotline service fee or the returned unit shipment charges. (Exh. 1026.)

As the foregoing illustrates, the parties clearly modified their agreement as to the May 23, 2005 purchase order. (Exh. 1026.)  The court rejects Defendants' argument that the modification related to this specific transaction only as well as their reliance on a provision in the Manufacturing Agreement precluding waivers.  First, while the parties' interaction could be seen as limited to the May 23, 2005 purchase order, the evidence as a whole (including the parties' conduct) suggests otherwise.  For example, while ESI/APH applied the $10/unit mislabeling credit to purchase orders subsequent to that agreement, Defendants never deducted the one-percent fee or otherwise raised the issue going forward.  And, as further discussed below, although the subsequent purchase orders included the several provisions contemplated by the parties, the two discussed herein are conspicuously absent.

Second, the issue of waiver is secondary in this respect because the court interprets Defendants' failure to assert their right to the 1% fee not so much as evidencing waiver, but the terms of the parties' modification of the service agreements. In light of the parties' course of dealing – including Defendants' faithful assertion of credits and reservation of rights during the course of performance – the court finds that the foregoing modification of the agreement applied prospectively as part of the parties' understanding, including the subsequent pricing for future purchases. (Accord Exhs. 2075, 2076, 2094) (ESI emails closely guarding right to timely shipments).  The court's conclusion is again bolstered by Eastech's testimony on the issue.

In short, the parties' negotiations before commencing business under the Manufacturing Agreement modified the contract, dispensing with some provisions in return for price reductions.  The parties' conduct as well as the physical evidence suggest that the modification applied prospectively.  The court thus finds that ESI/APH are not entitled to the one-percent fee associated with Eastech's failure to provide a toll free service line.

*5% Percent Fee For Late Shipments*

Defendants next argue they are entitled to the 5% fee associated with Eastech's late shipments. (Docket No. 205 at 30-32.)  Contrary to Eastech's argument, ESI/APH did not waive this provision or modify the agreement as to exclude ESI and APH's recovery of such fees. Exhibits 2075, 2076, and 2094 all demonstrate Defendants' reservation of the right to recover these fees.  And Defendants' failure to deduct these fees from specific purchase orders does not, by itself, imply waiver – especially not in light of the anti-waiver provision in the Manufacturing Agreement. (*See* Exh. 94 at 12.)

Eastech argues, however, that ESI/APH consented to the specific delays underlying this claim.  In calculating the claimed $370,936.00, Defendants rely on purchase orders P500000223, []271, []278, []292, and []301. (*See* Exh. 1005) (Defendants' calculation of 5% of those purchase orders); (Exhs. 1020, 1032, 1038, 1374, 1375) (purchase orders at issue).  The court agrees with Eastech that Defendants cannot recover these fees due to the parties' restructuring of the various delivery dates.

The court will not detail these events, but it is clear that Defendants consented to some of the late deliveries and requested modifications causing delays in others. Eastech provides a detailed account of the facts underlying this determination. (*See* Docket No. 204 at 39-42.)  The court has independently reviewed those facts, which are supported by email exhibits and trial testimony, and hereby adopts them.

The court adds that, even if it is determined that Defendants did not consent to some of the delays, they clearly consented to or caused others. (*See*, *e.g.*, Exhs. 1021, 1022, 1023.)  And, while Defendants computed their damages with reference to the five specific shipments, the modifications of the shipping dates cut across the different purchase orders, and are muddled by the parties' many fractured communications. Thus, because Defendants have not excluded those late shipments to which Defendants acquiesced from the calculation – and the apparent impossibility of such task – Defendants have not sufficiently established their claimed fees.

*Shipping and Return Costs*

Here, ESI/APH seek $302,841.00 in shipping and other costs associated with returns of defective products. (Docket No. 205 at 32-34.)  This claim fails for the same reason as the claim for fees associated with Eastech's failure to provide a toll free telephone number for customer service. (*See* 20-23, *supra.*)  The parties' negotiations before the first purchase order under the Manufacturing Agreement so modified the contract as to eliminate this provision. (Id.; *see also* Docket No. 204 at 48-49.)

The court adds here that ESI/APH's purchase orders always stated the terms of the specific purchases and, just like the 1% service fee, this provision for return costs is found in none of the relevant purchase orders.  This absence, coupled with the parties' agreements and ESI/APH's failure to deduct the fees from particular orders – as they had done with respect to the box mislabeling issue – suggest that the agreement was so modified as to dispense with these provisions.

*Adjustment for Prices of Replacement Goods*

ESI/APH argue they are entitled to $136,164.00 in price adjustments for repaired products. (Docket No. 205 at 34-35.)  The court agrees with Eastech that ESI/APH may not recover these fees. (*See* Docket No. 204 at 52-53.)  In short, although the Return Agreements provided that repaired goods would be "adjusted to the existing wholesale price" at the time ESI/APH received the goods, each shipment of repaired goods was preceded by a specific purchase order from ESI/APH setting forth the price per unit. ESI/APH cannot now complain they were charged a price above that provided for by the parties' agreements, especially not after setting those prices in the purchase orders.

Further, ESI/APH's calculation does not provide for the difference between the sale prices and the "existing wholesale price," but for the difference between the sale prices and *ESI/APH's* actual price.  The two are not necessarily the same.  The latter, it bears noting, appears to be an after-the-fact recoupment of ESI/APH's alleged losses on some orders.  Thus, to the extent such damages are recoverable, ESI/APH failed to properly calculate their fees and the court cannot do so based on the record.

*Damages Resulting From Alleged Epidemic Defects*

ESI/APH also seek damages resulting from epidemic failures. (Docket No. 205 at 36-38.)  Specifically, ESI/APH claim they incurred $284,314 in "lost logistics expense" and $15,991 in resale costs due to a shipment that had defective inverter boards and another with mislabeled gift boxes. (Docket No. 205 at 36-38)  First, it is not clear how many units suffered from the defective inverter boards, nor what damages ESI/APH suffered as a result.  While the court was presented with evidence that a shipment of televisions had loose inverter boards, no reliable figure was given as to the total defect rate, and many of the units sold by Costco were apparently never returned.  Of those units returned, furthermore, no defect rate was established. (*See* Docket No. 204 at 55-57.)  As to the mislabeling issue, Costco remedied this problem for next to nothing, and ESI/APH took nearly $400,000 in credits as a result.

Defendants' remaining counterclaims ring hollow in light of the court's foregoing determinations and do not merit further discussion. (*See* id. at 58-61.)

24

**IV.    CONCLUSION**

Eastech shall recover $1,325,147.00 on its first four claims; $353,061.00 on its fifth claim; $176,677.79 on its sixth claim; nothing on its interference with business relations claims; and $375,000.00 in presumed damages on its libel per se claim. Defendants shall take nothing on their counterclaims.  Eastech is to lodge a proposed judgment accordingly.  Eastech is entitled to its attorneys' fees under the Manufacturing agreement and shall file an application calculating the reasonable fees incurred in this litigation.

**SO ORDERED**

DATED: February 9, 2008

_____
Otis D. Wright II
United States District Judge